IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TARA HUDSON, | ) |
|         Plaintiff, | ) |
| vs. | ) Case No. 24 C 9646 |
| BUEHLER MOVING AND STORAGE, et al., | ) |
|         Defendants. | ) |

## ORDER DENYING PLAINTIFF'S MOTION TO VACATE JUDGMENT

On September 30, 2025, the Court entered an order dismissing plaintiff Tara Hudson's case with prejudice for failure to prosecute. Since that date, Ms. Hudson, who is unrepresented by counsel, has made numerous filings in an effort to persuade the Court to vacate the judgment. The Court has given Ms. Hudson several opportunities to attempt to get a viable proposed amended complaint on file. She proved to be unable to do so or to comply with the Court's guidance. The Court has now reviewed Ms. Hudson's most recent attempt at an amended complaint. This version, like the others, does not state any viable claims. The Court therefore denies Ms. Hudson's motion to vacate the judgment.

The Court first reviews the procedural history of the case. Ms. Hudson filed a *pro se* lawsuit against Buehler Moving Companies on October 7, 2024. She alleged she had worked for Buehler as a driver. Ms. Hudson alleged discrimination based on her race (Black) and gender (female) and retaliation for complaining about discrimination, and she also asserted a claim for discrimination based on her former military service

under a statute whose acronym is USERRA. Ms. Hudson alleged that she had received a notice of right to sue from the EEOC on June 28, 2024, which appeared to make certain of her claims about 10 days late. *See* 42 U.S.C. § 2000e-5(f)(1). Buehler moved to dismiss or to require a more definite statement. It argued that the discrimination and retaliation claims were untimely because she had not filed suit within 90 days after receipt of the EEOC notice of right to sue; the USERRA claim was deficient; and the complaint was vague and confusing and did not clearly spell out how Ms. Hudson contended Buehler had violated the law.

The Court held a telephonic hearing on June 12, 2025 and attempted to clarify whether October 7, 2024 was the date the EEOC *sent* the notice of right to sue or the date Ms. Hudson *received* it. Ms. Hudson did not recall the date on the notice but said she believed she had received the notice by mail. At the conclusion of the hearing and in the order entered after the hearing ended, the Court directed Ms. Hudson to file the EEOC notice with the Clerk. Ms. Hudson then filed a partial response to Buehler's motion to dismiss. She contended that she had sent her complaint to the Clerk via the online *pro se* filing portal within 90 days after she received the EEOC's notice of right to sue, but the Clerk did not accept the filing, so she refiled the complaint a few days later. Ms. Hudson's submission also attached the EEOC notice, which was *issued* on June 28, 2024, making it nearly impossible for her to have received it on that same date.

The Court held another telephonic hearing on July 28, 2025. The Court indicated that there was likely a factual dispute that precluded finding the Title VII claims untimely, at least on a motion to dismiss. The Court then brought up Buehler's argument that the complaint was so vague that it was hard to tell what Ms. Hudson claimed Buehler had

2

done or failed to do. The Court, after inquiring about Ms. Hudson's efforts to retain counsel, suggested that she consider filing a motion to appoint counsel and directed the Clerk to send her the necessary forms for such a motion.

Ms. Hudson did not file a motion to appoint counsel. At the next telephonic hearing, on August 21, 2025, she advised the Court that she did not want counsel appointed and wished to continue to proceed *pro se*. Ms. Hudson also said she was working on an amended complaint and asked for another week to file it. The Court gave Ms. Hudson until August 29 to file an amended complaint, gave Buehler until September 19 to file a response, and set the case for a telephonic hearing for September 30. But Ms. Hudson did not file an amended complaint within the time the Court had allotted and did not request an extension of time. And she failed to appear for the September 30 hearing. On that date, the Court directed the entry of judgment dismissing the case for want of prosecution.

On October 12, 2025, Ms. Hudson filed a motion to vacate the judgment. She said that she had missed the September 30 hearing date because she had written down the date wrong. She also said that she had completed a proposed amended complaint. Ms. Hudson filed her proposed amended complaint the next day. Unfortunately, the proposed amended complaint was at the opposite extreme from the bare-bones original complaint she had filed. Specifically, it was 51 pages long, plus 90 exhibits, and it contained—literally—a day-by-day narrative of her experiences working for Buehler from June through November 2023.

The Court entered an order on Ms. Hudson's motion to vacate the judgment on December 27, 2025. The Court reviewed the proposed amended complaint under 28

3

U.S.C. §1915(e)(2) to determine if it was frivolous or failed to state a claim upon which relief may be granted. In the proposed amended complaint, Ms. Hudson sought to add four new corporate or entity defendants, none of which she alleged had been her employer. The Court reviewed these allegations and determined that Ms. Hudson could not assert claims against these entities under the statutes she cited in her proposed amended complaint. *See* Dec. 27, 2025 Order at 4-5. As for Ms. Hudson's asserted claims against Buehler, the Court concluded that these allegations largely failed to state viable claims. *See id.* at 5-6. The Court then stated:

> The fourth and equally important problem with the amended complaint involves its prolix and discursive nature—including, in particular, the day-by-day narrative that it includes. One can't tell from the amended complaint how any particular day's events fit into Ms. Hudson's claims against Buehler. That is the problem when a plaintiff does not provide a "short and plain statement" of the plaintiff's claims: it's impossible to tell what goes where. After reading the narrative, one is left wondering what Ms. Hudson contends *Buehler* did that violated her rights under any of the cited statutes. The proposed amended complaint is subject to dismissal on this basis alone. *See, e.g., Cable v. Kuraray Am., Inc.*, No. 24-1244, 2024 WL 4499766, at *2 (7th Cir. Oct. 16, 2024) (collecting cases).

*Id.* at 7.

The Court denied Ms. Hudson's request to file the proposed amended complaint but did not, at that point, deny her motion to vacate the judgment. Rather, the Court stated that it would "give Ms. Hudson one final chance—one—to get a viable proposed second amended complaint on file." *Id.* The Court then provided Ms. Hudson with the following guidance:

> The proposed second amended complaint needs to spell out clearly, for each of the statutory violations that Ms. Hudson alleges:
>
> - when each act alleged to have violated the law took place;
>
> - who on the part of Buehler was involved; and

4

>    - exactly what Buehler or its employees did that Ms. Hudson alleges violated her rights.
>
>    If Ms. Hudson's proposed second amended complaint does not comply with these requirements, the Court will deny leave to file the amended complaint and will deny her motion to vacate the judgment.

*Id.* at 7-8.

Ms. Hudson filed a proposed second amended complaint on January 26, 2026, but it attempted to incorporate material from her previous voluminous filings. This was inappropriate; a complaint *itself* needs to include a short and plain statement of the plaintiff's claims and cannot appropriately incorporate earlier filings. The Court could have ended matters right there; it had expressly given Ms. Hudson just one final chance. But the Court gave her yet another opportunity to get a viable complaint on file, entering an order that stated:

> Plaintiff's proposed second amended complaint repeatedly attempts to incorporate allegations and material from her first amended complaint, which was dismissed. This is inappropriate; a complaint has to be a self-contained document that does not incorporate material from separate filings. The second amended complaint is stricken. The Court give[s] plaintiff until 5:00 PM on Monday 1/26/2026 to file a corrected second amended complaint that complies with this order and the Court's prior directives (see, e.g., dkt. no. 56). If plaintiff does not do so, the Court will enter judgment against plaintiff.

*See* dkt. 60 (order of Jan. 24, 2026).

Ms. Hudson filed a revised second amended complaint on January 26, but the next scheduled hearing was the following day, January 27. The Court had not had sufficient time to review her submission before that, so after a brief hearing the Court continued the matter to February 3. During that hearing, Buehler's counsel stated the following (the Court derives this from its rough transcript of the January 27 hearing):

> [I]n my . . . reading all of these versions, I don't see that Ms. Hudson is actually

5

> claiming that she's an employee of Buehler companies, she was not an employee and I don't see that claim and a lot of her claims and allegations, a lot of her claims are related to employment issues where you would need to be an employee to bring the claim. So I'm wondering if she's suggesting she is or is not. That's not evident in any of the versions of any of the complaints.

Ms. Hudson responded as follows:

> Your Honor, if I may, per the FLSA, how the employee is defined there, I meet the requirements to be it -- I am an employee or I was an employee of Buehler moving and storage at the time that the incident occurred.

The Court said it would consider this in reviewing Ms. Hudson's proposed second amended complaint. Ms. Hudson thereafter filed, without seeking leave of court, a supplemental submission setting forth her views of the law regarding her status as an employee or independent contractor and including additional allegations. *See* dkt. 63.

The proposed second amended complaint, like at least one of the earlier attempts, provides a list of dates and events and then appears to translate each of these into a separate claim for relief. Ms. Hudson asserts 35 separate purported claims for relief, each of which appears to involve a single one of the events alleged in the "statement of facts" section of plaintiff's filing. Most of the claims invoke Title VII of the Civil Rights Act of 1964; others cite the federal Fair Labor Standards Act; and at least one is based on the federal Equal Pay Act. Most, but not all, of the federal claims also reference a parallel state law claim. Some claims reference only state law.

**1.      Claims under FLSA**

In 10 of Ms. Hudson's proposed claims—Counts 7, 9, 10, 12, 16, 17, 20, 24, 25, and 32—she asserts as violations of the Fair Labor Standards Act claims that, as she describes them, involve delays in paying her (Counts 7, 16, and 17), erroneous payroll deductions (Count 9), a pay decrease (Count 10), lower-than-expected pay (Count 12),

6

and unexplained chargebacks against her pay (Counts 20, 24, 25, and 32). None of these allegations come close to plausibly alleging violations of the FLSA. The pertinent provisions of the FLSA requires an employer to pay its employees a wage of at least $7.25 per hour (i.e., the minimum wage), and one-and-one-half times the employee's regular hourly rate for hours worked over 40 in a single week. See 29 U.S.C. §§ 206(a), 207(a). That's it. The FLSA does not govern payroll deductions or chargebacks, the timing of payment of wages, or unfulfilled expectations regarding pay. The proposed second amended complaint alleges nothing within the scope of the FLSA's requirements—even assuming that Hudson was an "employee" of Buehler, as opposed to an independent contractor.

2.  **Claims under Title VII / parallel state statutes**

A significant number of the "counts" in Hudson's proposed second amended complaint involve, under various headings, what appear to be attempts to assert claims of a hostile work environment based on race and/or gender violative of Title VII of the Civil Rights Act of 1964 and parallel state statutes. This includes the following 13 counts: 2, 3, 4, 5, 6, 13, 15, 18, 22, 23, 27, 28, and 29. Based on the factual allegations made by Hudson, most of these "counts"—all but 2, 4, and 28—involve allegations of harassment by persons who would not be considered supervisors of Hudson under established hostile work environment law: dispatchers, other drivers, payroll personnel, an "operations assistant," etc.

To sustain a hostile work environment claim based on the conduct of non-supervisors, an employee (assuming that is what Hudson was) must show that (1) she was subject to unwelcome harassment; (2) the harassment was based on her race or

7

gender; (3) the harassment was severe or pervasive; and (4) there is a basis to hold the employer itself liable. *See, e.g., Scaife v. U.S. Dep't of Veterans Affairs*, 49 F.4th 1109, 1115-16 (7th Cir. 2022); *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019). In determining whether the conduct is severe or pervasive, courts consider all the circumstances, including: "(1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim." *Scaife*, 49 F.4th at 1116. And for there to be a basis for employer liability, a supervisor must have been a participant in the harassment or the employer must be "negligent in discovering or remedying co-worker harassment." *Liu v. Cook County*, 817 F.3d 307, 318-19 (7th Cir. 2016).

In her separate proposed claims alleging a hostile work environment, Ms. Hudson describes a handful of incidents over a period of about six months of employment (late May through late November 2023) involving problems with particular work assignments (Counts 2, 5, 22, and 23); delays in paying her on two occasions (Counts 18 and 27); a female worker (identified as an "operations assistant") recording Ms. Hudson at a worksite (Count 15); a conversation in her supervisor's office where the same female operations assistant "treated and spoke to me with contempt and hostility" (Count 28, *see also* Compl. ¶ XXVIII); unspecified "sexist misogynistic behaviors, body shaming and demeaning speech" by co-workers in Colorado on a particular date (Count 6); a single comment by a co-worker that Ms. Hudson characterizes as "a racially demeaning comment which implied that I either look like or act like a man" (Count 3);

unspecified "physical touching" by a co-worker (Count 29); and comments by a male supervisor on a single date regarding the size of Ms. Hudson's nose (Count 4)

Even though in separate "counts," the Court considers all this conduct together. Most of the incidents are not tied—by Ms. Hudson in her proposed second amended complaint—to her race or gender. That aside, the conduct cited by Ms. Hudson does not amount to "pervasive" misconduct of the sort needed to give rise to a viable hostile work environment claim. In the overall scope of the five-month period when Ms. Hudson worked for Buehler, the actions she cites cannot reasonably be characterized as "frequent." And Ms. Hudson cites only one incident that can plausibly be characterized as *physically* threatening. Finally, though the conduct may have been unwelcome and offensive to Ms. Hudson, from an objective standpoint, it does not add up to a hostile work environment that is actionable under Title VII or parallel state law.

As for supervisor-based harassment, Ms. Hudson cites only an incident on a single date when she contends her supervisor made adverse comments about the size of her nose (Count 4). This was verbal commentary only; Ms. Hudson does not allege any tangible adverse consequences. And though the Court certainly understands why Ms. Hudson might consider this incident as indicative of racial bias, she cites nothing *overly* racial about the supervisor's comments. This alleged inappropriate conduct by the supervisor does not give rise to a plausible claim for relief—even if Buehler was in fact Ms. Hudson's "employer" as the law uses that term.

In addition, this conduct does not violate the Illinois Human Rights Act any more than it violates Title VII. The standards under the two statutes are the same. *See, e.g., Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017); *Volling v. Kurtz*

*Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016); *Zaderaka v. Ill. Human Rights Com.*, 131 Ill. 2d 172, 178, 545 N.E.2d 684, 687 (1989).

This leaves three Title VII/IHRA claims asserted by Ms. Hudson in the proposed third amended complaint. The first is Count 1, alleged as a retaliation claim. Ms. Hudson alleges that when she interviewed with Buehler in May 2023, the operations manager mentioned her previous employment—where she had made a complaint about discrimination—and suggested she find a job elsewhere. But a retaliation claim requires adverse action by the employer, *see Gnutek v. Ill. Gaming Board*, 80 F.4th 820, 824 (7th Cir. 2023), and on Count 1 Ms. Hudson alleges none: despite the manager's comments, Buehler *did* hire or contract with her at that time.

Ms. Hudson also asserts retaliation in Count 35, in which she says Buehler "has refused to verify my employment for two years" after she stopped working for Buehler. But Ms. Hudson does not identify any dates or particular incidents, despite the Court's specific directive in its December 27 order. That aside, the materials submitted to the Court reflect that Ms. Hudson has not administratively exhausted these post-employment claims by filing and pursuing charges before the Equal Employment Opportunity Commission and/or the Illinois Department of Human Rights. At an earlier juncture, Ms. Hudson submitted, under Court order, what was represented to be all of the EEOC/IDHR charges she had filed. None of these made any reference to post-employment retaliation by Buehler.

Finally, in Count 33, Ms. Hudson asserts a constructive discharge claim under Title VII and the IHRA. A constructive discharge claim requires a work environment that is *more* severely adverse than what is required for a hostile work environment claim:

"[a] hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). Because Hudson's underlying allegations are insufficient to give rise to a viable hostile work environment claim, they are necessarily insufficient to give rise to a viable claim for constructive discharge.

3.  **State law claims regarding infliction of emotional distress**

Next are Ms. Hudson's 4 proposed claims for intentional infliction of emotional distress (IIED)—Counts 8, 26, 30, and 31—and a single proposed claim for negligent infliction of emotional distress (NIED)—Count 19. Here are the bases for each of these claims as alleged in the proposed second amended complaint:

- Count 8: A dispatcher "routed me to a location tied to past service-related trauma."

- Count 26: A supervisor "made a sarcastic comment about the location of my mother's death." (Actually, as more specifically described in ¶ XXVI, Ms. Hudson alleges that the supervisor made a "sing-song" reference to Pensacola, Florida, which is where her mother had recently died.)

- Count 30: A dispatcher assigned Ms. Hudson to a shipment that delivered to a warehouse about 3 miles from the company from which she leased her tractor;

- Count 31: A dispatcher routed Ms. Hudson to 3 destinations "associated with my mother's death."

- Count 19 (NIED): Because of delayed or withheld pay by Buehler, Ms. Hudson got a repossession notice from her tractor leasing company for nonpayment.

11

A claim of IIED under Illinois law requires proof of three elements: the defendant's conduct was truly extreme and outrageous; the defendant intended to inflict severe emotional distress or knew there was a high probability that his conduct would cause such distress; and the conduct in fact caused severe emotional distress. *Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041, ¶ 50, 77 N.E.3d 50, 63 (2016). Liability exists only when "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* ¶ 51, 77 N.E.3d at 60. A claim of NIED likewise requires proof of extreme and outrageous conduct by the defendant. *See, e.g., Scheidt v. Floor Covering Assocs., Inc.*, No. 16 C 5999, 2018 WL 4679582, at *15 (N.D. Ill. Sept. 28, 2018). IIED (and thus NIED) claims arising from actions in the employment context are generally disfavored, and liability exists only where the employer's actions have been "truly egregious." *See Richards v. U.S. Steel*, 869 F.3d 557, 567 (7th Cir. 2017); *Vickers v. Abbott Labs.*, 308 Ill. App. 3d 393, 410, 719 N.E.2d 1101, 1115 (1999).

Each of Ms. Hudson's IIED/NIED claims fails on the requirement of "extreme and outrageous" conduct. Each involves a single incident that although, perhaps troubling to Ms. Hudson, do not meet the definition of "extreme and outrageous" conduct. At least three of the claims suggest the notion that there were particular geographic areas that Ms. Hudson—an over-the-road driver who was being dispatched to move peoples' belongings—evidently considered off-limits. There is no indication in the proposed second amended complaint that there was any common understanding between her and Buehler that she would not have to drive to Florida, Georgia, or anywhere near the

company from which she had leased her tractor. And even if so, this alleged misconduct by Buehler is not in any way comparable to cases in which IIED or NIED claims have been upheld.

4.  **Equal Pay Act / parallel state claims / Count 14**

This leaves three (or four) last claims in which Ms. Hudson appears to assert a violation of federal law: Counts 11, 21, perhaps 34, and 14. In the first two of these claims, Ms. Hudson cites the federal Equal Pay Act. A claim under the Equal Pay Act requires a plaintiff to show: "(1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions." *Fallon v. State of Illinois*, 882 F.2d 1206, 1208 (7th Cir. 1989).

That is not what Ms. Hudson alleges in Count 11: her claim there is that other drivers got preferential assignments, not that they were paid at different rates for substantially the same work. (And as previously discussed, this does not state a claim for violation of the FLSA, which involves a requirement to pay the minimum wage and time plus one-half for overtime work.)

This is also not what Ms. Hudson alleges in Count 21, in which she again alleges that she got worse assignments than other workers. That does not give rise to a claim under the federal Equal Pay Act. And because claims under the Illinois Equal Pay Act are analyzed under the same standards claims under the federal statute, *see, e.g., Loos v. County of Perry*, No. 3:20-CV-1107, 2023 WL 6382364, at *10 (S.D. Ill. Sept. 30, 2023), Ms. Hudson's reference to the state statute in these claims does not change the analysis. These are not viable claims.

Count 34 cites the Illinois Equal Pay Act and alleges failure to provide Ms. Hudson with "financial statements," by which she appears to mean itemized pay statements. That does not implicate the state Equal Pay Act, which like the federal state involves a requirement to pay men and women the same rate for performing the same or substantially the same work, not a requirement to document this in pay statements.

In Count 14, Ms. Hudson alleges a gender discrimination claim based on a female operations assistant providing her with extra large uniform shirts and saying "I'm not going to show everything that I've got." *See* 3rd Am. Compl. ¶ XIV. Though that is arguably a demeaning comment, it doesn't amount to a violation of Title VII, as Ms. Hudson contends. "Title VII protects against discrimination, not 'personal animosity or juvenile behavior." *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) (cleaned up). Being asked to wear a larger-size uniform shirt does not amount to "harm respecting an identifiable term or condition of employment," as required. *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024).

**5.     Remaining claims**

The only proposed claims the Court has not addressed thus far are Ms. Hudson's state-law claims under the Illinois Wage Payment and Collection Act regarding allegedly improper deductions or holdbacks from her pay or failure to pay her at an allegedly agreed-upon rate. Ms. Hudson may be able to assert a state-law claim or claims based on these points, but not in federal court. These are state-law claims that, taken together, do not meet the threshold amount for diversity jurisdiction—assuming the parties are of diverse citizenship, which the Court does not know. Thus the Court's

denial of Ms. Hudson's motion to vacate the default judgment does not preclude her from pursuing *in state court* state-law IWPCA claims for the deductions and holdbacks and pay cuts referenced in Counts 9, 10, 12, 20, 24, 25, and 32 of the proposed second amended complaint.

## Conclusion

For the reasons stated above, the Court denies plaintiff's motion to vacate judgment [dkt. 33] and also concludes that all of plaintiff's proposed claims in her second amended complaint, aside from the possible state-law IWPCA claims found within proposed Counts 9, 10, 12, 20, 24, 25, and 32, fail to state viable legal claims. Any IWPCA claims must be pursued, if at all, in state court.

Date:  February 19, 2026

_____
MATTHEW F. KENNELLY
United States District Judge